POTOMAC ELECTRIC POWER COMPANY
*v.* BIRKETT ET AL.

[No. 296, September Term, 1957.]

(Two Appeals In One Record)

478

*Per Curiam filed June 4, 1958.*

*Opinion filed July 2, 1958.*

*Motion for rehearing and for stay of mandate, filed July 8, 1958, denied July 17, 1958.*

The cause was argued before Brune, C. J., and Hender-son, Hammond, Prescott and Horney, JJ.

*Richard W. Emory,* with whom were *William J. McCarthy* and *Venable, Baetjer and Howard* and *James H. Pugh* on the brief, for appellant.

*Herbert M. Brune,* with whom were *R. Edwin Brown* and *John E. Oxley* on the brief, for appellees.

Hammond, J., delivered the opinion of the Court.

The Potomac Electric Power Company (Pepco) appealed in one record from final judgments and orders of the Circuit Court for Montgomery County in two cases dismissing its petitions to condemn land, for the construction of an electric transmission line to serve the Washington Metropolitan area, on a holding that Pepco had no right of eminent domain in Maryland. Having reached a conclusion to the contrary, we reversed the judgments and orders appealed from by per curiam order. We now state our reasons for so doing.

Pepco is a domestic corporation of the District of Columbia and of Virginia that furnishes electricity to Washington and the heavily populated suburban areas of nearby Virginia and Maryland counties. Since 1909 it has been qualified to do

business in Maryland and has supplied electricity to residents through its lines located on public roads. By consolidation, merger or purchase, Pepco has succeeded over the years to the assets, property, rights and franchises of various light and power companies. One of these was Great Falls Power Company (Great Falls), a corporation chartered in 1894 by the Virginia Legislature for the purposes of generating electricity at Great Falls in the Potomac River and transmitting and selling electric power. By amending Chapter 540 of the Acts of 1894 by Chapter 245 of the Acts of 1900, the General Assembly of Maryland conferred upon Great Falls a state-wide franchise to construct electric transmission and distribution lines along public roads, and also conferred upon it power to acquire by condemnation land necessary for its corporate uses and purposes, saying that it "* * * shall have the same full, ample and like powers for acquiring by agreement, purchase, gift or condemnation property for its uses and purposes as a railroad company would have under the provisions of the aforegoing Article 23 of the Code of Public General Laws of Maryland, and any amendments thereto * * *." Chapter 245 of the Acts of 1900, added two further provisions. One authorized Great Falls to erect dams anywhere in the Potomac River necessary to accomplish its purposes and objects and for that purpose to have the same powers of condemnation as had railroad corporations. The other authorized the company to consolidate or merge with, or sell its assets to, any corporation with purposes not inconsistent with those of Great Falls and provided that upon the merger, consolidation or sale being accomplished, "* * * all of the assets, rights, franchises and properties of every kind and description whatsoever shall be and become the assets, rights, franchises and properties of the company so resulting from said consolidation, lease, merger or otherwise, as fully and to all intents and purposes as if the powers herein conferred had been expressly granted to such consolidated or merged company * * *." The act further bestowed upon any appropriate domestic or foreign corporation the power to act with Great Falls to accomplish the processes and results authorized.

Great Falls accepted the grant of rights given it by the Maryland Legislature and acquired a tract of land in the State near the Great Falls of the Potomac. It employed engineers to make studies looking to the construction of a power dam and the generation of electricity by water power, and had a survey and plan of its proposed dam approved by the Maryland Board of Public Works. Thereafter in 1902, two-thirds of the capital stock of Great Falls was acquired by Washington Railway & Electric Company (Washington Railway), a holding company which owned Pepco and utilized it to take title to and operate electric properties acquired by it. After Great Falls was bought by Washington Railway, its activities came to a virtual standstill, because it was contemplated that its assets, properties, rights and franchises would be utilized by Pepco. Nevertheless, Great Falls maintained its corporate existence. It held regular meetings of stockholders and directors and regularly paid its Virginia and Maryland franchise and property taxes and Federal and State income taxes. In 1947, Washington Railway, which by then owned all of the stock of Great Falls, and Great Falls both were liquidated under the Public Utility Holding Company Act of 1935, pursuant to an opinion and order of the Securities and Exchange Commission. The mechanics were that Great Falls transferred all of its assets to Washington Railway, and Washington Railway immediately transferred them to Pepco. The real estate was transferred by deeds and all other assets of every kind, nature and description were conveyed by assignments. As consideration for the deeds and assignments Pepco assumed all obligations of Washington Railway, which just before had assumed all obligations of Great Falls.

In 1955 Pepco found itself in need of greatly increased generating capacity to meet the foreseeable demands of its system and proposed to build an additional generating plant. The original site chosen was in Virginia just above the Great Falls of the Potomac River. The United States Army Engineers and the Department of Defense required Pepco to move the site upstream because of plans for a water supply reservoir immediately above Great Falls and because it was de-

sired to have the station further from Washington and less vulnerable to a bombing attack in case of war. The best available location under the conditions laid down by the Army Engineers and the Department of Defense was found to be Dickerson, Maryland, about twenty miles from Great Falls and several miles from the Potomac River near the mouth of the Monocacy River. A dam was to be built because millions of gallons of water a day from the Potomac River will be used for the new plant in the condensation of steam and for other purposes.

In order to conduct electricity from the Dickerson generating plant to where it could be used in the system, Pepco planned to construct a transmission line across Montgomery County. Finding itself unable to agree on a purchase price with various landowners, it instituted a number of condemnation suits, two of which are those before us. The proceedings in these two cases were instituted in February of 1957. In June of that year Pepco filed in each case an application for a decision on questions of law before further proceedings, pursuant to Maryland Rule 502, requesting the court to determine that it had the legal right to acquire by condemnation the land necessary for its transmission line. The cases were consolidated for the purposes of this preliminary determination and in September, after a hearing, the Circuit Court found for Pepco. On rehearing, the court reversed itself and entered the final judgments and orders appealed from, adjudging that Pepco had failed to establish that it had the power of eminent domain in Maryland and dismissing the petitions in the two cases, without leave to amend.

Pepco contends that it acquired the power of eminent domain in Maryland that the legislature gave Great Falls and the successors of Great Falls. The landowners counter that the court could not make a preliminary determination of the right to condemn because Code, 1957, Art. 33A, Sec. 9, requires that issues of law relative to that right, as well as questions of fact, are to be determined at the trial after the jury has viewed the property. Appellees argue from this premise that the final judgments and orders appealed from were cor-

rect, apart from the merits, in that Pepco's testimony as to its right to condemn was erroneously taken in clear violation of the statute and must be treated as if it were not in the case. On the merits the landowners argue (a) that condemnation of their property, located many miles from Great Falls, for a transmission line unconnected with the generation of electricity by water power at Great Falls, is outside the scope of the power of condemnation conferred on Great Falls; (b) that the consent of the State of Maryland was given only to a consolidation, merger or sale of assets by Great Falls, but not to a transfer of the power of condemnation; (c) that Great Falls did not even purport to transfer to Pepco whatever rights of condemnation it possessed or, indeed, any rights or franchises, except those exercisable "at or near the Great Falls"; (d) that the franchise and condemnation powers of Great Falls had expired before the 1947 conveyances because they had never been used; and finally, (e) that the power of Great Falls to acquire land by condemnation or by other means was limited by the Maryland Legislature to two thousand acres, and since Pepco holds more than two thousand acres of land in Maryland, it has no power to acquire more.

We think it plain that the question of the right to condemn properly was determined by the court as a preliminary matter. This question, of course, was one for the court to decide. *Lustine v. State Roads Commission,* 217 Md. 274, just decided. Code, 1957, Art. 33A, Sec. 4 gives the court in condemnation cases the same power to permit amendments to petitions, answers and other proceedings "as in other actions at law" and provides further that "all demurrers, motions and other proceedings therein, except as otherwise herein provided, shall be disposed of in accordance with the rules and practice in said court now governing in the trial of other civil cases at law." We held in *Herzinger v. City of Baltimore,* 203 Md. 49, that because of the conformity provisions of Sec. 4 of Art. 33A, the rule of court abolishing bills of exception took precedence over another section of Art. 33A providing for bills of exception. Maryland Rule 502 provides that at any stage of the case the court may, for convenience, have raised for decision, in any expedient way,

including the production of evidence, any question of law. If this is done such further proceedings as may be rendered unnecessary by the decision of such question shall upon the decision be stayed, and the decision reached is reviewable on appeal after final judgment. We find the rule to be applicable to proceedings under Art. 33A. The landowners argue that the limitation in Sec. 4, that the proceedings shall be in accordance with those governing other civil cases at law "except as otherwise herein provided", requires that issues of law as well as fact be decided under Sec. 9 of Art. 33A only after the jury has viewed the premises. We think that the issues of law to be so decided in Sec. 9 are only those which have not previously been determined. At a time when the provisions now codified as sections 4 and 9 of Art. 33A were in effect, the Court held in *Davis v. Board of Education,* 166 Md. 118, that there was no right of appeal from a preliminary determination that a petitioner had a right to condemn because that was not a final judgment, but accepted as a matter of course the fact that the question had been decided in advance of the trial by decision on a demurrer to a plea in bar. See also *Herzinger v. City of Baltimore, supra,* where determinations as to the right to condemn were made before the trial by rulings on a demurrer and on exceptions to particulars and to interrogatories and the procedure was at least implicitly approved by this Court.

The first three contentions of the landowners may be answered together. If Pepco succeeded to the franchises and all of the rights of Great Falls, as we think it did, as a transferee company "incorporated for purposes not inconsistent with the objects of the Great Falls Power Company", it acquired the right of eminent domain throughout Maryland. The fact that Pepco, in the exercise of powers not derived from Great Falls, is to generate electricity at a site some twenty miles from that originally contemplated would not make condemnations for the transmission of that electricity, under the authority derived from Great Falls, outside the scope of the power granted that company by the Maryland Legislature. Pepco could exercise, in combination, rights and powers it owned independently of Great Falls and those it acquired from that company. It did not lose existing

powers or rights by acquiring others as a transferee or successor corporation. *State, Use of Dodson v. Baltimore & Lehigh R. R. Co.,* 77 Md. 489, 491-492. In any event, the generating site and the line of transmission are not too far or too different from those contemplated by the legislature to vitiate the rights granted Great Falls and inherited by Pepco. The new location and the change in the method of generation of power result from changes in technology and, as in the original plans, the waters of the Potomac are to be heavily utilized, although now for the condensation of steam and not for the turning of generators.

The appellees' real reliance is that Great Falls could not transfer its power of eminent domain without a consolidation or merger with another company, and that a mere sale of assets and franchise would not transfer that right. It is clear that unless the Legislature consents, a sale of assets and franchise does not of itself carry the right of condemnation.[1] It seems equally clear that a legislative statement that, if there is a sale of corporate assets, the transferee shall succeed to rights and franchises means that the right of eminent domain is included and constitutes an implied legislative redelegation of, or consent to, the transfer of that right. 1 *Nichols, op. cit.,* Sec. 3.211; 29 *C. J. S., Eminent Domain,* Sec. 26. Mr. Justice Holmes said for the Supreme Judicial Court of Massachusetts in *Abbott v. New York & N. E. R.*

---

1. This, essentially, was the basis of the holding of *Riden v. Philadelphia B. & W. R. R. Co.,* 182 Md. 336, that a power to condemn was not conveyed by a lease of all operating property. When the Court said that the power of eminent domain is "inalienable", it could have meant no more than that it was not to be redelegated or transferred without legislative approval. The rule that a lessee does not take the lessor's right of eminent domain seems uniform. 1 *Nichols, Eminent Domain* (3rd ed.), Sec. 3.211 [4]; *Western Union Telegraph Co. v. Pennsylvania R. R. Co.,* 195 U. S. 594, 49 L. Ed. 332. Furthermore, the lease in the *Riden* case stated: "Provided always, however, that nothing herein contained shall operate to grant or demise, the franchise to be a corporation possessed by the said Lessor, or any other right, privilege or franchise which is or may be necessary to fully preserve the corporate existence or organization of the said Lessor."

*Co.* (Mass.), 15 N. E. 91, 99, in speaking of the right of condemnation by a corporation which had acquired that right by *purchase* from another corporation: "It seems to us equally clear that a corporation, by consent of the legislature, may take this power as *quasi* successor of another corporation to which it was originally granted; and it is not very material whether the legislative consent be regarded as authorizing a transfer of the old power, or, more strictly, as delegating a new power in the same terms as the old.  * * * The substance of the transaction is seen in cases of consolidation.  * * * But there is nothing in reason to confine it to such cases.  * * * When the power is claimed under the form of a transfer, rather than of original grant, the legislative consent or grant may be inferred somewhat more readily than when the whole question is new; because the legislature has already adjudicated the use to be public, and has granted a co-extensive power.  * * * For while it is very plain that the power could not be transferred to or exercised by a purchaser from the original donee without such consent or grant, in this commonwealth,  * * * the reasons which have led some courts and judges to doubt the need of such consent for the transfer of franchises show that the *delectus personarum* is of little more than theoretical importance, and is the least determining element in the more common cases where the power is conferred.  * * * And this reasoning is of equal force whether the power to take land by eminent domain is properly called a franchise or not."

In *Miocene Ditch Co. v. Lyng,* 138 F. 544, 546, the Ninth Circuit Court of Appeals said that the general rule was that a foreign corporation can acquire no right to condemn land in a State unless that right is expressly conferred by statute, but went on to say, largely on the strength of the *Abbott* case: "But this rule has been so far modified that the power of a domestic corporation to take land by the right of eminent domain has been held to pass by implication to a foreign corporation, as, for example, where it succeeds by *deed* to the rights and powers of a domestic corporation." (Emphasis supplied.)

In *Connecticut Light & Power Co. v. Bennett* (Conn.),

141 A. 654, the Rocky River Power Company bought the rights and franchises of the Housatonic Power Company. It was held that Connecticut Light & Power, into which Rocky River Power was merged, held and could exercise the power of condemnation that Housatonic had originally been granted by the legislature. The essential holding of *Reeves v. Philadelphia Suburban Water Co.* (Pa.), 135 A. 362, was that the right of condemnation was acquirable by purchase without merger or consolidation, and a similar result was reached in *Lawrence v. Morgan's Louisiana & T. R. & S. S. Co.* (La.), 2 So. 69, and in *Dismal Swamp R. Co. v. John L. Roper Lumber Co.* (Va.), 77 S. E. 598. See also *North Carolina R. R. v. Carolina Central R. R.,* 83 N. C. 489; *State v. Newark & H. Traction Co.* (N. J.), 49 A. 812.

In *Canal Co. v. Railroad Co.,* 4 Gill & J. 1, this Court held that the Potomac Company, to which the Legislature gave the right of condemnation, could pass that right, unused by Potomac for over forty years, by assignment to the C. &. O. Canal Co., which, as assignee of Potomac, stood in its place "and is invested with the same prior and paramount right" of Potomac. In the *New Central Coal Co. v. The George's Creek Coal & Iron Co.,* 37 Md. 537, the transfer of a corporate franchise to new owners before organization of the corporation was held to carry over the granted power to condemn.

The appellees further say that because exemption from taxation does not pass from the favored corporation to a successor, the same must be true of the right of condemnation. This Court has pointed out the differences, as has the Supreme Court of the United States. In *Gontrum v. Life Insurance Co.,* 177 Md. 624, 635, Judge Offutt for the Court was dealing with the power of a receiver to transfer to the corporate successor of the Royal Life Insurance Company its privilege to do an industrial life insurance business in Maryland. It was held that the privilege was transferrable, amounting to "a right, privilege or franchise" within the meaning of the Code authorizing sales, and that the rights and privileges of Royal passed to purchasers of its "franchises and property". Judge Offutt said: "Cases relating to exemption

from taxation, relied upon by the appellant, are not in point, since here is no actual analogy between an exemption of that character and a grant of power, since the one is a waiver and the other a grant." It was held that the statute granted to certain classes of industrial insurance companies "the privilege or right of doing business upon terms specified in it." For enunciation of the same principle, see *Morgan v. Louisiana*, 93 U. S. 217, 23 L. Ed. 860. The Maryland Legislature in the Act of 1900 made no distinction as to how a corporation, whose purposes were such as to make its possession of Great Falls' rights appropriate, succeeded to the property, assets and rights of Great Falls, making plain that the succession was to be full, complete and effective whether those assets passed by consolidation, merger or sale.

We find that Great Falls intended to transfer and did transfer to Pepco the rights of condemnation it possessed. By virtue of the opinion and order of the Securities and Exchange Commission, the holding company, Washington Railway, was liquidated and in a single reorganization, carried out through a series of almost simultaneous transactions, Great Falls was absorbed by Pepco through the liquidation of Great Falls and Washington Railway. In the process, all assets of every kind of Great Falls were sold, transferred and conveyed to Pepco. Through Washington Railway as a conduit, Great Falls deeded to Pepco all of its lands and "rights appertaining thereto, wherever located", together with "all the water rights, privileges and powers" it held. Similarly, by assignment, Great Falls "transferred, assigned and delivered" to Pepco "all of its assets of every nature and description and wheresoever located * * *." Section 3 (a) of the Maryland Act of 1900 provided that upon the accomplishment of a sale of the assets of Great Falls to a corporation with similar powers and purposes "all of the assets, rights, franchises and properties *of every kind and description whatsoever*" (emphasis supplied) became automatically by operation of law "the assets, rights, franchises and properties" of the transferee "as fully and to all intents and purposes as if the powers herein conferred had been expressly granted" to the transferee. We think that when

Great Falls transferred to Pepco all of its assets of every kind and description, Pepco took the right of eminent domain in Maryland "as fully and to all intents and purposes" as if the Legislature had originally granted it to Pepco. The power to transfer and assign utility franchises and rights has long been recognized. *Brown v. Maryland Telephone Co.,* 101 Md. 574; *Mayor and Council of Crisfield v. Public Service Commission,* 183 Md. 179. *Canal Company v. Railroad Company,* 4 Gill & J. 1, cited above, recognizes that the right of eminent domain is, with legislative approval, a transmissible right like a utility franchise.

We find it plain that the franchise and condemnation rights and powers of Great Falls had not expired before the 1947 conveyance to Pepco because of non-use. Great Falls maintained its corporate existence and retained power to exercise its rights throughout its corporate life. In 1953, after a full hearing in which Pepco asserted its rights and Montgomery County vigorously denied them, the Public Service Commission, deciding the very issues raised in this case, found that although the franchise of Great Falls had never been exercised by Pepco, its exercise might be useful in the rendition of public service in Montgomery County, and on May 15, 1932, ordered that Pepco be authorized to "exercise such franchise as it may have acquired from Great Falls Power Company directly or indirectly from some intermediary corporation * * *." An appeal from this order by Montgomery County to the Circuit Court for that County was dismissed with prejudice. In *Canal Company v. Railroad Company, supra,* it was held that the right of eminent domain and other rights to which the Canal Company succeeded were in force and effect although they had lain dormant for the forty-four years the Potomac Company, the transferor, had owned them.

The landowners' last contention is that because Pepco owns more than two thousand acres of land in Maryland, it may not acquire more since Great Falls is limited to holding no more than that acreage. Pepco has been qualified to do, and has been doing, the electric utility business in Maryland since 1909. Over the years it has acquired land for stations, substations, offices and transmission lines and presently owns

more than two thousand acres of land in the State. As a qualified foreign corporation, it may hold land as fully as a domestic corporation. Code, 1957, Art. 23, Secs. 9 (6) and 88 (a) ; *Reisig v. Associated Jewish Charities,* 182 Md. 432. Substantially all of the land that Pepco owns in Maryland was acquired and is held in the exercise of powers independent of those it acquired from Great Falls. As we have noted, Pepco, in acquiring the franchises, rights and properties of Great Falls, did not thereby surrender the rights it already had or otherwise acquired under Maryland law. We think that in acquiring Great Falls' right of eminent domain Pepco did not lose its independent right to hold more than two thousand acres. Under Code, 1957, Art. 23, Secs. 71 (3), 72 (1), a transferee, successor or survivor corporation acquires "the property, rights, privileges and franchises of the transferor * * *." The statute nowhere provides nor does it or the cases give any indication that it is the law or policy of the State that the transferee or survivor corporation gives up any rights it previously had. *State, Use of Dodson v. Baltimore & Lehigh R. R. Co.,* 77 Md. 489, 491-492, *supra.*